THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SALVATORE CAMPAGNA, Plaintiff in Error.

*Opinion filed June 16, 1909.*

1. MURDER—*circumstantial proof of corpus delicti must be acted upon with great caution.* In a prosecution for murder the *corpus delicti* may be proved by circumstantial evidence where it is the best evidence obtainable, but great caution should be observed in acting upon it.

2. SAME—*Supreme Court will not hesitate to reverse conviction if the evidence of guilt is very unsatisfactory.* The Supreme Court will not hesitate to reverse a judgment of conviction for murder on purely circumstantial evidence where the evidence for the People does little more than raise a suspicion of the guilt of the accused, while the testimony of many witnesses for the accused, if believed, together with other circumstances, including an absence of apparent motive and the conduct of the accused after the alleged crime, raise, on the whole evidence, a grave doubt of his guilt.

WRIT OF ERROR to the Circuit Court of Stephenson county; the Hon. R. S. FARRAND, Judge, presiding.

BERNARD P. BARASA, for plaintiff in error.

W. H. STEAD, Attorney General, and LOUIS H. BURRELL, State's Attorney, (JOEL C. FITCH, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

The plaintiff in error, upon a trial by jury in the circuit court of Stephenson county, was found guilty of the murder of Felice Casata and sentenced to the penitentiary for fourteen years.

The deceased, Casata, was employed by the Illinois Central Railroad Company at Freeport to tend the lamps used on the semaphores and in other places in the railroad yards. In order to provide a place for him to work and keep the oil necessary for use, the company had located a railroad

box-car at the side of the tracks and turned it into a work-shop. In this car were two or more oil tanks holding considerable kerosene, and possibly other oil. About three hundred feet westerly of this car, and on the same side of the tracks, was a small railroad telegraph office, known as West Junction. All of the main events referred to in the testimony took place on the afternoon of June 18, 1908, between this office and the city of Freeport, which is about a mile east of West Junction. The telegraph operator at this place, Paul Mandler, testified that he was notified about 4:37 P. M., by Lester Higley, a boy about eleven years old, who was fishing in a small pond near the office, that the oil car was on fire. Mandler testified that he ran to the car and found the door locked, and that he then ran back to the office and got a key and unlocked the door. About twenty minutes thereafter Daniel Tierney, the section foreman, came to the scene, and about the same time Philip Casata, a brother of the deceased, came. It was not known at this time that a human being was in the burning car. Philip Casata asked the operator where his brother was, and was told that he had gone towards Freeport. The testimony is that Philip Casata took a "speeder" (a small three-wheel car for the use of one person upon the railroad) and went to Freeport to look for his brother. Between six and seven o'clock that evening the chief of police of that city was notified and came down on a hand-car, and a number of Italians, including plaintiff in error and Philip Casata, came about the same time. At or about the time the chief of police arrived, a body was discovered lying face down in the burning car. After quenching the flames somewhat with water the remains were taken out. It was found that only the skeleton was left, with only a small portion of the flesh on the breast, where it had been against an iron plate in the car. A watch and some keys, identified as belonging to Felice Casata, were also found on or near the remains. Mandler testified that he knew Felice Casata

well, having seen him often at his work; that he saw him go into the oil car about seven minutes before he saw it was on fire. This was the last that Felice Casata was seen alive by any of the witnesses. No other proof than that already stated was offered to show that the remains found in the car were those of Felice Casata. We find nothing in the record to indicate that the skeleton was that of a person of the same height as the supposed deceased.

Counsel for plaintiff in error contends that it has not been shown that any crime was committed or that the person burned was Felice Casata. The rule is well settled in this and other jurisdictions that the *corpus delicti* may be proved, in a prosecution for murder, by presumptive or circumstantial evidence, where that is the best evidence obtainable, but great caution should be observed in acting upon it. (*Campbell* v. *People,* 159 Ill. 9, and authorities there cited.) We are not prepared to say that the evidence in this record was not sufficient to justify the verdict of the jury that the skeleton was that of Felice Casata. In view of our conclusion on another branch of the case we deem it unnecessary to comment further on this question.

The evidence is uncontroverted on this record that the relations between plaintiff in error and Felice Casata were of a most friendly nature; that they were acquainted in the old country before they came here and had always been the best of friends, and, indeed, some of the testimony is that they had treated each other like brothers and used endearing Italian terms in their conversations. They had never been known to quarrel. No motive for the commission of the crime by plaintiff in error is suggested except that he wanted Felice Casata's position as lamp tender. Plaintiff in error did succeed to the position the day after the fire, but the testimony shows conclusively that he did not ask for the place but was put there by the man in charge of that work, who testified that the plaintiff in error was the man best fitted for the place among those from

whom he could pick. Plaintiff in error was working as one of the section hands on the railroad at and near West Junction. We should judge from the record that the pay he received as section hand was practically the same as that he would receive as lamp tender.

The argument that counsel for defendant in error present as showing that the decedent did not die by suicide or from injuries caused by an accidental explosion of the oil is, that the car door was found locked by a spring lock on the outside, one key being in the possession of Mandler and the only other key to the car having been in the possession of the deceased and having been found near the remains in the burned car. It appears from Mandler's testimony that there was another door to the car, but whether it was locked at the time no one testified, and there is no proof in the record as to whether the car had windows. If we assume that Felice Casata was murdered, the question remains, Does the evidence prove the plaintiff in error guilty of the crime?

In order to understand the testimony a short description of the railroad yards will be of assistance. The telegraph office, known as West Junction, lies at the north-westerly part of the locality where the events occurred. Close to it is a pond of water and a culvert running underneath the track. There are two main tracks of the Illinois Central railroad at this point. A few feet easterly of the telegraph office a switch track branches off to the north, and about three hundred feet from said office, on the north side of the switch, the oil car was located. About fifteen hundred feet east of the oil car an overhead bridge crosses the tracks. A little east of this bridge the switch track branches into thirteen different switch tracks. The switch tracks and the two main tracks run along side by side for about three-quarters of a mile, when they again converge into three tracks near an organ factory. There are a few houses on the south side of the tracks near the organ factory, but ap-

parently there are no houses near the tracks on either side between the overhead bridge and the telegraph office at West Junction. While the evidence on this record is not clear upon this point, the depot in Freeport appears to be located about two miles east of the organ factory. The tracks from West Junction to the organ factory run a little south of east. Plaintiff in error boarded at the house of Dominick Paulona, about a block and a half west of the organ factory and about two blocks south of the main line of the railroad. The street that runs on the west side of Paulona's house does not appear to have been graded near the railroad, and from the end of the graded street two foot-paths lead to the railroad tracks. Just west of these two paths are two large iron pipes which run northerly under the railroad tracks. They are apparently used for draining the water under the right of way from south to north, and empty into a low place or little gully north of the tracks. On June 18, 1908, the locality, except for the railroad tracks, appears to have been grown up with tall weeds and vegetation, and appeared considerably like open country outside a city.

The plaintiff in error did not work the afternoon of June 18. It is claimed he told one witness that he laid off because he was sick, and another that it was because it was a holiday. He testified that he laid off in order to have a letter written to his brother in Chicago, but that as he himself could not read or write he had arranged with one Frank Marosa to write the letter for him that afternoon. He found Marosa, as we understand, at a brick office near the railroad tracks, near the depot in Freeport, about three o'clock on the afternoon in question, and they both testified that Marosa wrote the letter at that time and directed it to the brother in Chicago. Plaintiff in error testified that after the letter was written he went to the post-office, apparently a few blocks away, and mailed it. The envelope in which the letter was sent was identified by Marosa, and

bears the stamp-mark of the Freeport post-office showing it
was stamped at 5:00 P. M. on the day in question. Marosa
and plaintiff in error both testified that Campagna left with
the letter between 3:30 and 4:00 o'clock that afternoon.
After mailing the letter, plaintiff in error testified he went
to Franz's saloon and then followed along the city railway
track westerly toward the organ factory; that he wanted
to wash his feet and wished a place that was not too pub-
lic; that he went in and got a drink of water in a vinegar
factory; that he went from there to the Illinois Central
railroad tracks and followed them westerly to the iron pipes,
where he washed his feet. He testified that just before he
reached the iron pipes he passed two men, Bentz and Goetz,
at work on some cars on one of the switch tracks; that
having washed his feet in the little gully at the mouth of
the iron pipes heretofore referred to, he put on his shoes
and went in a south-westerly direction across the switch
and main tracks, where he saw a boy named Johnny Col-
lins, and from there he went in a south-easterly direction
to his boarding place at Paulona's, which he reached about
half-past four. There are at least four witnesses who tes-
tified he was at or near Paulona's place before five o'clock.
Mrs. Panelli and her little daughter met him a little dis-
tance from Paulona's house, and it was stipulated that Mrs.
Panelli would, if present, testify that it was then shortly
after 4:30. Mrs. Paulona and her daughter, Mary, said
he reached their house at 4:30. Other persons saw him in
or near the house about five o'clock. Bentz thought he
was near the water pipes about four o'clock and Goetz fixed
the time at 4:10 P. M. Both of them testified that they
did not see him go to wash his feet at the pipes west of
them, but that the last they saw of him he was walking
down one of the switch or lead tracks in a north-westerly
direction toward the overhead bridge. Joseph Dorr, who
was working under a car on the switch tracks about a quar-
ter of a mile west of the iron pipes, testified that he saw

plaintiff in error walking rapidly by him on one of the switch tracks towards the overhead bridge at 4:10. He did not claim that either spoke, but testified that he was looking out from under the car while he was kneeling down at work, and that after plaintiff in error passed he stepped to the end of the car and looked at him again. The telegraph operator, Mandler, was due to be at his duties at West Junction at four o'clock. He left his boarding house in Freeport a little before four, took a speeder and rode down the main tracks by the organ factory through the switch yards, passing under the overhead bridge, he thought, at four o'clock that afternoon, and he testified that as soon as he passed under the overhead bridge he saw a man west of him on the lead or switch track, about half way between the overhead bridge and the oil car; that this man was standing still, with his face towards the north and his back towards the main tracks, and stood still in that position until the operator passed him. The main track, upon which the operator's speeder was traveling, was at this point about one hundred feet south of the lead or switch track upon which the man was standing. The operator testified that he thought the man was urinating at the time he saw him; that he saw his back, and had, as he passed, a side view. He identified plaintiff in error the next day at the police station in Freeport as the man in question, although he said he never saw him before June 18. Plaintiff in error, on the afternoon in question, wore a brown slouch hat, a blue coat and dark pants. He admits that he had this suit on. Bentz and Goetz testified that he had his coat on his arm when he was near the iron pipes. Dorr testified that the man who passed his car, some quarter of a mile west, had his coat on his arm at that time. The man that the operator, Mandler, saw half way between the overhead bridge and the oil car had on a brown hat, a blue coat and dark pants. Plaintiff in error claimed he had on his old shoes, while Dorr testified that he had on a pair of shoes that

were shiny and black. The other witnesses did not testify as to the shoes that plaintiff in error, or the man on the tracks, were wearing.

As we have said, Mandler testified that he was notified of the fire by young Higley; that the time was about 4:37, which he fixed by a train that had just passed. Philip Casata, who was working with the section gang a little east of the overhead bridge, testified that he saw smoke rising from the oil car earlier than this,—about a quarter after four. Young Higley testified that just about the time he notified Mandler of the smoke coming from the car he noticed a man running away from the car and along the switch or lead track toward Freeport; that the man wore dark pants and a brown hat and carried a dark coat on his arm. Mandler came out at once, and testified that he saw a man running on the lead (switch) track about half way between the oil car and the overhead bridge; that the man was dressed in dark pants and had a dark coat on his arm and was wearing a slouch hat. He thought at the time it was Felice Casata and that he was running to get help because the car was on fire; that Casata smoked a great deal, and because of this he told the brother, Philip Casata, shortly thereafter, that Felice Casata had gone to Freeport. John Heck, a boy aged fifteen years, who was fishing with young Higley and Mandler, came up on the railroad shortly after Mandler was notified, and he also saw the man running near the overhead bridge. His testimony as to the man's dress was similar to that of Higley and Mandler. Neither young Higley nor Heck identified plaintiff in error as the man that was running away. About a quarter of a mile south-easterly of the overhead bridge and an eighth of a mile south of the railroad tracks were situated the Richards farm house and out-buildings. Mrs. Richards and her daughter, about five o'clock in the afternoon in question, saw a man passing through the yard, apparently in a direction a little north of east, towards the railroad tracks,

240—25

but although they had seen the plaintiff in error previous to this they did not recognize him as the man. The Richards farm house is about a quarter of a mile west of the house where Johnny Collins lives. The age of young Collins is not found in the record, but apparently, from the remarks made at the time he was testifying, he was quite a small boy. He testified that he knew the plaintiff in error and saw him on that afternoon, between four and five o'clock, just south of the railroad tracks, sitting on a green box, apparently reading or writing,—he was not certain which,—only a short distance from his house. The Collins house was about two hundred feet southerly from the railroad tracks. He testified that the plaintiff in error then went toward town, keeping to the south of the tracks, and that they spoke to each other. Later on Collins testified that he first saw plaintiff in error near the Richards farm house, crawling through a hole in the fence.

The next day, or the next day but one, after the oil car was burned Campagna was taken into custody by the police authorities of Freeport. They required him to go with them over the route which he claimed he had gone over the day in question, and they also took him to the place where Joseph Dorr was at work and through the Richards farm yard. The police officer who had him in charge testified that Campagna objected to going through the hole in the fence through which young Collins said he saw him come, and another police officer testified that he gave as his reason, later on, for not wanting to go through, that there was a big dog in the yard, of which he was afraid. Plaintiff in error on the witness stand gave as his reason for not wanting to go through the hole in the fence that it was a barbed wire fence and he was afraid he would tear his clothes; that the police officer who went through first did tear his clothes. The police officer also testified that while they were at the Richards place Campagna offered him money if he would let him go. Plaintiff in

error denies this, but says that the police officer offered to let him go if given money. Plaintiff in error had but a few dollars in money of his own at this time, and it is quite apparent from this record that he could have had but little hope of obtaining any considerable amount from relatives or friends. There is also some testimony that the police authorities used plaintiff in error roughly,—tore his clothing, kicked him and threatened him,—in trying to get him to confess that he committed the alleged crime. The police denied this. We do not consider the testimony on this question or as to what took place at the Richards farm house as having any material bearing on the determination of the guilt or innocence of plaintiff in error.

About 5:30 o'clock plaintiff in error met the boys Heck and Higley near the organ factory as they were carrying a string of fish they had caught at West Junction. He did not have any money with him, so he went to Dominick Paulona's house to get some and bought some of the fish. They testified that he asked at that time what the smoke was up west, and that they told him it was the oil car burning, and he said, "By God." Plaintiff in error testified that the first he heard of the fire was between six and seven that evening, and that shortly thereafter he went up to the car.

The theory of the State apparently is that plaintiff in error, after passing Bentz and Goetz near the iron pipes, walked down through the switch yards along by Joseph Dorr ,and under the overhead bridge; that half way between the overhead bridge and West Junction he was passed by Mandler; that he went on to the car, had some dispute with Felice Casata and killed him in some way unknown; that he then set the car on fire and locked the door and ran back down the lead track; that near the overhead bridge he left the tracks and went in a south-easterly direction to the Richards farm, then through the Richards farm yard, and back, in a north-easterly direction, towards the railroad tracks, where he passed young Collins, and

then along the railroad tracks towards the street which runs just west of the Paulona house, and up the foot-path heretofore spoken of, to his boarding place. The theory of the defense is that plaintiff in error went but a short distance west of the iron pipes; that when he crossed the railroad tracks, on leaving the iron pipes, he saw young Collins near his house and spoke to him, and then turned in a southerly direction up the foot-path towards his boarding place. If Bentz and Goetz are right as to the time when they saw plaintiff in error near the iron pipes and Dorr is right as to the time he claims he saw him about a quarter of a mile west of there, then Mandler is mistaken as to seeing him at four o'clock half way between the overhead bridge and the oil car. If Bentz and Goetz saw the plaintiff in error at 4:10, or even at 4:00 o'clock, it would be most unreasonable, if not impossible, to believe that he walked from that point, about three-quarters of a mile west, to the car, committed the crime, set the car on fire, locked the door and was well toward the overhead bridge again by 4:37. The evidence of the State as to the time when plaintiff in error was seen at various times along the railroad tracks is so contradictory, in our judgment, as to raise a reasonable doubt of the guilt of the plaintiff in error. The doubt raised by this conflict in the evidence as to the time when plaintiff in error was seen along the railroad tracks is re-enforced by the character of the testimony of some of the State's witnesses. Young Higley, about eleven years old, contradicts himself on several points with reference to what was done in and about the burning car just after he noticed a man running away from it. Johnny Collins, whose age, as we have said, we do not find in the record, contradicts himself flatly in different parts of his testimony as to where he first saw plaintiff in error and where he stood with reference to his home at the time he first saw him. Dorr's opportunities for seeing and recognizing the plaintiff in error were most unfavorable, as were

those of the operator, Mandler. It can readily be seen how both of them might be mistaken in testifying that plaintiff in error was the man they saw on the track on the afternoon in question. Mandler, as we have seen, thought the man running away from the car, who was apparently similar in build and size to the man he passed in going to West Junction about half an hour before, was the deceased, Felice Casatà. The apparent contradictions in plaintiff in error's testimony during the various conversations with the police authorities a day or two after the burning of the car must be judged in view of the fact that while understanding English fairly well, as he testified, he talked so poorly that the trial court thought it necèssary to have an interpreter for him during his examination on this trial. Furthermore, we do not think any of his contradictions material. If the testimony of a half dozen witnesses as to the time when he reached his boarding place is to be believed, then there can be no question but that he did not commit the alleged crime in the oil car between 4:00 and 4:37 that afternoon. There is not, in our judgment, any evidence in the record showing any satisfactory motive for him to murder his intimate friend. No one that afternoon heard him saying or saw him doing anything that indicated guilt, unless it be the testimony of the boy Collins, who stated that he was stooping, as if to hide himself, when he first saw him going easterly, south of the tracks. The section men, who knew him well, were working along the switch tracks between the iron pipes and the overhead bridge all that afternoon until the fire took place. The operator who left West Junction when he was relieved at four o'clock by Mandler went east on the speeder to Freeport. Neither he nor any of the section men saw plaintiff in error along the tracks that afternoon. So far as the record discloses, the plaintiff in error's actions from the time the alleged crime was committed up to the time of his arrest are fully consistent with his innocence. He went with Philip Casata,

and the man with whom he boarded, to the scene of the fire, and while the police authorities testified that he seemed excited, the evidence shows that he stated (what was true) that Felice Casata was an intimate friend of his, and that he helped take care of the brother, Philip, who was also greatly excited when the skeleton was found in the burning car. There is testimony tending to show that the brother tried to injure himself at that time, and plaintiff in error took the brother to his own boarding place that night and was with him the next day. Philip Casata was called as a witness by plaintiff in error on the trial.

A conviction is asked in this case upon circumstantial evidence alone. "The unquestioned rule in such case is, that before conviction can properly be had the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis." (*Mooney* v. *People,* 111 Ill. 388.) We think this has not been done in this case. The evidence does not carry with it a reasonable certainty of the guilt of plaintiff in error. On the contrary, the evidence for the State, standing alone, does little more than excite a suspicion of guilt. With all the evidence for the prosecution considered, it is not of that convincing character that satisfies the mind. On this record there must be a reasonable doubt of the guilt of the plaintiff in error. While this court is fully committed to the doctrine "that the jury in their deliberation are the judges of the facts and the weight of the evidence in all criminal cases," yet this court should not hesitate to reverse a judgment of conviction in a criminal case where the evidence on which it is based is of such an unsatisfactory character as it is here. (*Keller* v. *People,* 204 Ill. 604; *Cunningham* v. *People,* 210 id. 410; *Waters* v. *People,* 172 id. 367; *Marzen* v. *People,* 173 id. 43; *Newman* v. *People,* 223 id. 324; *Dahlberg* v. *People,* 225 id. 485.) As presented in the record this case is so surrounded with mystery and doubt that it is our duty to set aside the judgment of conviction.

There are other objections urged by plaintiff in error which we deem it unnecessary to discuss.

The judgment of the circuit court of Stephenson county will be reversed.

*Judgment reversed.*