(No. 22171.—

The People of the State of Illinois, Defendant in Error, vs. Harry F. Oberlin, Plaintiff in Error.

*Opinion filed February 23, 1934.*

Jones, J., dissenting.

M. J. Dolan, Sumner & Reardon, Gilbert Hutchens, and C. H. Reardon, (W. J. Reardon, of counsel,) for plaintiff in error.

Otto Kerner, Attorney General, Richard Clyde Chappell, State's Attorney, J. J. Neiger, and Walter J. Chapman, for the People.

Mr. Justice Stone delivered the opinion of the court:

Plaintiff in error was tried in the circuit court of Greene county on an indictment charging him with the murder of his wife, Clara. The indictment was returned in Jersey county and was transferred to Greene county on change of venue. He was found guilty of manslaughter and seeks reversal of the judgment on the ground that the evidence does not support the verdict, and that errors were committed on the trial in the admission of testimony and in instructions given the jury.

There is no dispute as to the homicide. Plaintiff in error's contention has been, and is, that the shooting was an accident. It appears from the record that plaintiff in error and his wife had been married for something over twenty years and lived in the city of Jerseyville. Urias Oberlin, father of plaintiff in error, resided with them. Their home is in a one-story, five-room house. It faces south. The rooms on the south side of the house consist of a living room in the southwest corner and a bed-room in the southeast corner. North of the living room, and connected therewith by a cased opening, is the dining room. North of the southeast bed-room, and between it and a bed-room in the northeast corner of the house, is the bath-room. Doors open from the bath-room into each of the bed-rooms. A door leads from the living room into the southeast bed-room and from the dining room into the northeast bed-room. The kitchen is on the north side of the house. The only testimony in the record concerning the shooting and how it occurred is that of plaintiff in error and his father. Other witnesses, some of whom were called to the house by plaintiff in error, testified concerning events shortly following the shooting.

Plaintiff in error was, and had been for a number of years, employed as a rural mail carrier. On the morning of April 16, the day of the homicide, he, accompanied by his wife, drove his usual mail route, returning to Jerseyville about noon. She asked what he desired for lunch, and he told her not to bother but to go on over to see her mother, who was ill. This she did and plaintiff in error went down-town. During the afternoon he and one Pearl Skinner returned to plaintiff in error's home, where each had two drinks of whisky and then returned to the downtown district. About five o'clock that afternoon, plaintiff in error, Skinner and one William F. Shephard returned to plaintiff in error's home in Shephard's car and while there took one or two drinks of whisky. During the time they were there plaintiff in error's wife came in and objected to drinking in the house, and the three men shortly after left and went down-town in Shephard's car, where Skinner got out of the car and Shephard and plaintiff in error, with the latter driving, went to Shephard's home. Declining the latter's invitation to take him home, plaintiff in error walked home, arriving about 6:30. When he entered the house his wife and his father were seated at the table in the dining room and both asked him to sit down with them. He replied that he did not want anything to eat and went into the bath-room to shave and change his clothing preparatory to attending a dance, where he was to play in the orchestra. His father testified that some time after plaintiff in error went through the dining room he heard a noise in the south bed-room as if something had fallen, and that he left the table and went through the living room to the door of the south bed-room; that plaintiff in error was there, standing in front of a dresser in the southeast corner of the room and had a gun in his hand; that witness spoke quickly to him; that plaintiff in error was facing the northwest corner of the room, and that as the witness spoke to him there was a sharp report

of the gun and he could see the fire from it; that the bullet struck a chair which was standing by the bath-room door and glancing from there hit first the casing of the bath-room door and then a medicine chest in the bath-room, where it fell to the floor. On hearing the report of the gun, Mrs. Oberlin, who up to that time had been seated at the dining table, left the dining room, passed through the north bed-room and through the bath-room into the south bed-room, and as she appeared at the bath-room door she exclaimed, "Oh, my God!" and rushed toward plaintiff in error; that she tripped or her feet slipped on the floor, and she supported herself from falling by catching the back of the chair with her left hand and with her right attempted to take the gun from plaintiff in error by seizing the barrel of it. As she was attempting to wrest it from him the gun was again discharged. The evidence shows that the bullet entered the palm of her right hand at the base of the thumb and emerged from the underside of her right arm at a point about six inches below the elbow. It then entered her side just below the ribs on the right side, pierced her liver and lodged beneath the skin just above the hip bone on the left side. The palm of her right hand was badly powder-burned. She did not fall, but plaintiff in error aided her to the chair which she had caught when she slipped. He then went from the south bed-room to the telephone in the dining room and called Dr. Charles C. Potter.

Dr. Potter testified that on receiving the call he was not told the trouble and replied that he was very busy with a number in the office and asked if it would be just as well to come later, and that plaintiff in error urged him to come at once, which he did. On his way to the telephone to call Dr. Potter plaintiff in error laid the revolver on a ledge in the cased opening which separated the living room and dining room. He then returned to his wife and went through the bath-room and the north bed-room to

a sideboard in the dining room, where he was searching for some cloth with which to tie up the wounded hand of his wife when Dr. Potter came to the front door. Both he and the doctor testified that the latter asked him what the trouble was, and that plaintiff in error told him to "take care of my wife," pointing to the south bed-room, where she was sitting on a chair. The doctor asked her what had happened, and she made no reply. He suggested taking her to the dining room, where there was a better light, which was done with the assistance of plaintiff in error. She was there seated in a chair by the dining room table and rested her right arm on the table while the doctor prepared to dress the wound. He asked plaintiff in error to get a pan and some hot water, and the latter went to the kitchen for that purpose, and not finding a pan his wife directed him to the place where one was found, and he filled it with water and took it back to the dining room. While the doctor was engaged in binding up the wound in the hand plaintiff in error went to the telephone and called the residence of one William Hopper and asked for Hopper's wife, who was a sister of the deceased. He was informed she was not there, and he again called asking for her. Receiving the same information he then called the residence of one William Dower and asked for Frances Collenberger, another sister of his wife, and was likewise told that she was not at home. William Hopper then called plaintiff in error and asked him what the trouble was, and plaintiff in error began to cry and hung up the receiver. About this time plaintiff in error's father, an elderly man, fainted and fell to the floor, and Dr. Potter and plaintiff in error carried him to a couch in the living room. Dr. Potter noticing that plaintiff in error was very nervous told him to quiet down. On inquiry by the doctor as to whether she was hurt in any other place than her arm, Mrs. Oberlin replied that she was not. It was not until he observed that the side of her dress was torn

that he had any suspicion of the more serious injury. He at once suggested that she be moved into the bed-room, which was done with the assistance of plaintiff in error, and she was laid upon the bed. The doctor asked plaintiff in error to get a sheet, and Mrs. Oberlin requested that he get a nightgown. While Dr. Potter was dressing Mrs. Oberlin's wounds she asked him to look out for the revolver. The doctor looked for it and found it lying on the cased opening between the dining room and living room and placed it underneath the bed clothes on the bed on which Mrs. Oberlin was lying. While plaintiff in error was engaged in looking for the sheet and nightgown, as requested, William Hopper and his wife and William Dower came to the house. Later the doctor noticed that the bed clothing had been removed from over the revolver and gave it to Dower, and still later he regained it from him and put it under an overstuffed chair near the south wall of the living room.

Hopper called the sheriff, Byron L. McDow, and he arrived at the house shortly thereafter. On his arrival the doctor took the gun from under the chair and gave it to the sheriff, in whose possession it remained until the time of the trial. The sheriff testified that when he received the gun it was fully loaded. Who re-loaded it does not appear. There was also a box partly filled with cartridges in the house. The sheriff, on learning that plaintiff in error had shot his wife, placed him under arrest and took him to the county jail, where he remained until the 28th of June following, when he was released on bail. As he was being taken from the house plaintiff in error asked the doctor to "take good care of her." Shortly thereafter Mrs. Oberlin was taken in an ambulance to the hospital at White Hall. The sheriff testified that on the way to the jail he asked plaintiff in error why he shot his wife, and that plaintiff in error continually groaned and moaned but did not answer him.

William Hopper and his wife testified that when they came into the bed-room where Mrs. Oberlin was lying, Mrs. Hopper said, "What has happened?" and that Mrs. Oberlin replied, "Harry shot me," and on inquiry as to why, she said, "Wild women." No other witness testified to any such conversation. During the time covered by the testimony of William Hopper and his wife concerning the conversation between the latter and the deceased, several other persons, including the doctor, were in the room, where the doctor was engaged in caring for Mrs. Oberlin's wounds. It was objected that this testimony was not competent for the reason that it was not shown to be in the presence of plaintiff in error, and a motion was made to strike it, which was overruled. Hopper testified that plaintiff in error was in the doorway of the bath-room, and Mrs. Hopper, on being recalled to the stand, testified that he was in the bath-room, five or six feet away. Plaintiff in error testified that he had gone into the bath-room to urinate and had closed the door and heard no such conversation and was not present in the room at the time but was standing over the toilet in the farther end of the bath-room while the door was closed. Mrs. Hopper's testimony shows that she was at the side of the bed, facing Mrs. Oberlin, between the bed and the bath-room door. In such a position she had her back toward the door, and it seems scarcely probable that she knew whether plaintiff in error was within hearing distance. It was shown as impeachment that Hopper had testified on preliminary hearing that he did not know where plaintiff in error was when these remarks were made.

Frances Collenberger, sister of deceased, testified that on the way to the hospital at White Hall the deceased said, "I am done for," and then asked, "How is mamma?" and "Where is Harry?" and "Where is Will?"

It appears that during the time the doctor was dressing the wounds of Mrs. Oberlin plaintiff in error was very

much perturbed; that he wandered about over the house, and that the doctor told him he better get a grip on himself and calm down; that he took him by the arm and led him out of the room, and that later Dower, Hopper and the doctor interfered with his opening a dresser drawer in the bed-room and that a scuffle ensued. Plaintiff in error testified that his occasion for going into this room was to get the nightgown his wife had asked for and that he was in the act of opening the drawer when Dower and Hopper seized him; that they took him through the bathroom into the northeast bed-room and there released him, and that he did not have an opportunity to tell what he was going to the dresser for.

Plaintiff in error testified that when he came to the house on the evening of the homicide and went to the southeast bed-room to dress, he opened the drawer of the dresser to get some underwear and saw the revolver, a .44-caliber gun which he was accustomed to carry with him on the mail route; that he took it out of the drawer and out of its holster and cocked it and for some time contemplated the matter of suicide, and deciding that he should not do that he placed the gun on the dresser and went into the bath-room and shaved. Returning to the dresser to get a collar-clasp he noticed the gun was lying there cocked; that he picked it up with the intention of letting the hammer down; that it caught in the openwork of the scarf on the dresser, and he by that means pulled the scarf off the dresser and with it a box and a lamp and they fell to the floor, making considerable noise; that as he was letting the hammer of the gun down his father came to the door leading into the living room and said, "Harry, for God's sake, what is the matter here?" that as his father said this plaintiff in error's thumb slipped off the hammer and the gun was discharged, and the bullet from it struck the rocking chair as herein detailed. He further stated that as he stood for a moment looking to

see what damage was done, still holding the gun, his wife ran into the room through the bath-room and made an exclamation, and rushing around the chair seized the gun by the muzzle and that in attempting to get it from him the gun again exploded. He testified that she threw up her hand and he saw powder burns, and blood was coming from the wound, and that he assisted her to a chair and called the doctor. He testified that he did not intend to shoot her but that the shooting was accidental; that he had made up his mind when he opened the dresser drawer to commit suicide, and that that was not the first time he had thought about it. It will be observed that as to what occurred at the house there is no contradiction in the evidence other than has been herein detailed concerning the testimony of the Hoppers.

One Victor Heiderscheid testified that he went to the Oberlin home during the latter part of the week following the homicide and while there saw a couple of empty shells lying on the north kitchen window sill. In this he was contradicted by Belle Hocking, an aunt of plaintiff in error, who testified that she went to the Oberlin home Monday after the shooting and remained there for the balance of the week; that she cleaned up the house and dusted the woodwork in the kitchen and found no empty shells in the window or elsewhere, and that there were no empty cartridges in the house. Sheriff McDow also testified that he returned to the Oberlin home later that night and searched it for empty shells but found none.

Objection to Heiderscheid's testimony was urged on the ground that his name did not appear on the indictment and notice had not been served in ample time of the State's intention to use him as a witness. In this connection the State's attorney of Jersey county testified that he did not, until a few days before the trial, expect to use Heiderscheid as a witness, for the reason that he did not consider that he could give any material evidence. He did not know

that he would testify that he had found empty shells in the house until a few days before the trial, as he had testified to nothing of that kind before the grand jury. Counsel argue with force that these facts tend to show that Heiderscheid was unworthy of belief, and that had he known anything material to the issues the State's attorney would have found it out. As it appears that counsel for plaintiff in error, before the witness was called, were afforded sufficient time to learn concerning his testimony, it was not error to permit him to testify.

There was admitted in evidence also a letter which plaintiff in error wrote to his wife's mother while in jail. It is as follows:

"MOTHER DOWER—If I may still call you that. I have no way of getting to talk to you to tell you how sorry I am for what I have done. I know you feel pretty hard toward me. All of you do, and I can't blame you. If I could give my life and call it back I would gladly do it. If I had listened to her and let the damn whisky alone I would be all right. I know I have not been just all that I should be in some ways. She loved me better than her own life and gave it trying to save mine. What they do to me does not make much difference now except for Dad, and I want to ask you to please be kind to him if you can. He told me you folks wanted something. Anything you want you can have. I wish Frances and Jess would come to see me before I go. I know the folks are pretty mad and said things. I don't hold it against them. I can't, but as there is a God in heaven, I did not try to kill her. It was myself. Please try and think a little better of me if you possibly can. I beg your forgiveness for the sorrow I have caused you and hope you will find room in your heart to forgive. If you will do that for me I can accept my penalty with a better heart if you will let me know you forgive me. I love all of you folks from the bottom of my heart. Try and believe in me a little bit. If Frances will come, please bring the baby.

"I will close this letter with another plea for your forgiveness for my terrible act.

"Love to you, all of you, from a heart-broken boy.

HARRY."

Manslaughter, as defined by the statute, is of two kinds: voluntary and involuntary. To amount to voluntary man-

slaughter the killing must be upon the sudden heat of passion, caused by provocation apparently sufficient to make the passion irresistible. (*People* v. *Rice,* 351 Ill. 604; *People* v. *Crenshaw,* 298 id. 412.) This record is utterly devoid of any evidence tending to establish that the shooting was in the heat of passion. Involuntary manslaughter is killing in the commission of an unlawful act, or a lawful act without due caution or circumspection. (Smith's Stat. 1933, chap. 38, section 361.) It is not argued that at the time of the shooting plaintiff in error was engaged in an unlawful act. Was the homicide shown to have been occasioned by plaintiff in error while engaged in a lawful act without caution or circumspection? Careless handling of a gun of the character here shown may show such an utter disregard of human life as to amount to this want of due caution and circumspection which brings the homicide within the definition of involuntary manslaughter. The evidence here does not show such recklessness on the part of plaintiff in error. That he was in a perturbed state of mind is shown by his contemplation of suicide. There is no evidence that he was where he could see his wife or was making any attempt to go into her presence or suspected her coming before she ran into the room. She at the time the gun was first discharged was seated in the dining room, in the opposite corner of the house. He testified that when she rushed into the room she seized the gun, after having tripped or slipped in going by the chair, so that her left hand rested on the chair for support. There is nothing in the record to tend to indicate that this story was in any way improbable or untrue, but, on the other hand, the character of the wound, the powder burn in her hand, the point of entry in the palm of her hand and the course of the bullet, all indicate that she was leaning over, reaching forward, and that her hand was upon or very close to the end of the barrel of the gun. The fact that

the bullet traveled through her hand and along her arm a number of inches, passing out of it and into the side of her body, strongly indicates that she had hold of or was reaching for the gun. Had her hand been raised and her arm not been extended it seems probable that the bullet would have pierced her hand rather than course lengthwise through her arm.

Malice is not a factor in the crime of voluntary or involuntary manslaughter, as killing with malice, express or implied, is murder. The record is barren of evidence tending to show motive. Plaintiff in error and deceased had spent the larger part of the day together. She had accompanied him on his mail route. The only evidence in the record to which the People point as showing motive is the testimony of the Hoppers concerning the statement of the deceased as to "wild women." In addition to the high degree of improbability of the truth of this testimony, we are of the opinion that the character of proof concerning the presence of the plaintiff in error at the time the statement was said to have been made is such that the court should have allowed counsel's motion to strike it. The evidence discloses that the shooting occurred on Saturday evening, about seven o'clock. Mrs. Oberlin lived until some time Monday morning. During a large part of the interim she was conscious, yet no evidence of a dying declaration appears in the record. These facts, combined with an apparent solicitude on her part concerning plaintiff in error after she went to the hospital, raise a grave doubt as to whether she made the statement attributed to her by the Hoppers. It is important that testimony of that character be free from reasonable doubt as to its truthfulness. Especially is this true as applied to this case, where it constitutes the only evidence in any way tending to show that there had been trouble between plaintiff in error and his wife.

Plaintiff in error's letter to Mrs. Dower is relied upon by the State as amounting to an acknowledgment that he was guilty at least of manslaughter. Counsel for plaintiff in error also point to it as evidence that he did not intentionally kill his wife. He characterizes the shooting as "my terrible act." We are unable to view this letter, however, in the sense of a confession or as in any way inconsistent with his testimony in defense. He might well call the circumstance his terrible act, yet such characterization of it by him does not necessarily tend to show guilt on his part. It is true, as this court has often said, the jury are judges of the facts and the weight of evidence in criminal cases, yet this court will not hestitate to reverse a judgment of conviction in a criminal case when the evidence of guilt on which it is based is of such unsatisfactory character as appears in this case. (*People* v. *Campagna,* 240 Ill. 378; *Dahlberg* v. *People,* 225 id. 485; *Newman* v. *People,* 223 id. 324; *Waters* v. *People,* 172 id. 367.) Guilt is never presumed, and where conditions may be explained on a hypothesis of innocence it is the duty of the court to accept that explanation. (*People* v. *Ahrling,* 279 Ill. 70.) This record is singularly free from dispute in the evidence.

Not every act of negligence gives rise to criminal liability. Ordinary negligence denotes a negative quality in the one doing the act. Negligence, to become criminal, must necessarily be reckless or wanton and of such character as to show an utter disregard for the safety of others under circumstances likely to cause injury. (*People* v. *Anderson,* 310 Ill. 389; *People* v. *Adams,* 289 id. 339.) In this case the only fact in the record touching the shooting to which the People can point as indicating that plaintiff in error was guilty as found by the jury, is the fact that while his wife was apparently attempting to take the gun from him it was discharged. There is nothing inherently improbable in the testimony of plaintiff in error and his father, Urias Oberlin. As we have said, no motive

is shown. In fact, there is no evidence, other than the discredited statement of the Hoppers referred to, that may not reasonably be reconciled with the statement of plaintiff in error that this most regrettable shooting was an accident. There is no reliable evidence in the record that the discharge of the revolver was the result of criminal carelessness on his part rather than a result of the struggle for possession of the gun. A judgment of guilty of so serious a charge must rest on substantial evidence.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Mr. JUSTICE JONES, dissenting.