(No. 23652.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DEWEY HOOPER, Plaintiff in Error.

*Opinion filed October 27, 1936.*

U. G. WARD, R. I. PUGH, and PHILIP I. TURNER, for plaintiff in error

OTTO KERNER, Attorney General, KENNETH F. KELLY, State's Attorney, and A. B. DENNIS, for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

Dewey Hooper was convicted of burglary in the circuit court of Shelby county. In seeking a review of the record of that conviction several errors of law are assigned, but it will only be necessary to consider the facts.

Fred Hudson testified that he was manager of the Cowden Co-operative Equity Exchange on July 21, 1934, and on that date the exchange was shipping wheat; that they were loading a car which stood on a side-track about two blocks west of the depot in the village of Cowden and near a highway paralleling the railroad track; that they did not finish loading the car on the night of the 21st but put in the last truck-load that evening and closed the door of the car. He testified that this last load of wheat was not shoveled back but left in a mound in front of the door, and that when he came back on Monday morning there was a hole in the mound about three or four feet across, and that it looked to him as though eight or ten bushels had been removed. He further testified that he called the sheriff, who came with his deputy, and that they saw where wheat had been spilled around the car and observed car tracks, which he said led to the west, but stated no fact from which it could be determined which way the car was going. He further testified that they followed a trail of wheat about a mile and a half to the home of Delmar Tucker, where two sacks of wheat were found; that from there they went to the defendant's home, four or five miles away, and saw the defendant's sedan with the cushion out of the back seat; that "there was just enough loose wheat in it to tell there had been wheat in there," and that they found a sack

of wheat in the defendant's chicken-house which contained about a bushel. On cross-examination he testified that the wheat was hauled in by wagons and trucks from different farmers in the community, and that when they quit on Saturday night approximately 800 bushels of wheat had been placed in the car; that he did not see the wheat between Saturday night and Monday morning, did not know when the car door was open and could not tell whether wheat had been removed from the car; that just from appearances he could tell that some wheat had been removed from the mound. He further testified that some wheat had been spilled when shoveling it from the trucks into the box-car, and that the car tracks which they had observed were visible for only a half block; that the wheat along the road which he had mentioned on direct examination and which he said they followed to Tucker's place was just a few grains now and then, and that the wheat which had been spilled in loading had not been gathered up, amounting probably to a peck or a half-bushel alongside the car. He further testified that during that time they had wheat coming in right along—probably three or four cars; that the place where the car stood while being loaded was in plain view of the main street of Cowden, and that during that time children frequently played around there.

W. A. Wall, president of the exchange, corroborated the evidence of Hudson as to seeing a hole in the mound of wheat in front of the door of the freight car. He testified to going with Hudson, Herten, the sheriff, and the deputy sheriff, Moberly, to the defendant's home.

A. D. Herten, the sheriff, testified that when he arrived at the car it was half full of wheat; that there was probably a gallon and a half of wheat outside the car, and that "there had been some wheat scooped or moved." He testified, as did Hudson, about going to the home of Tucker and thence to Hooper's, and also to a conversation which he had with Hooper. He said he saw a few spoonsful of

wheat in cracks and other places in the back of Hooper's
Dodge sedan; that he asked Hooper what the wheat was
doing in his car, and that Hooper told him some boys had
thrown wheat at him when he and his family had been out
driving; that he asked Hooper where he got the wheat
that was found in the hen-house, and was told that it had
been purchased at the Cowden Equity. Hooper in his tes-
timony denied this last statement. The deputy sheriff,
Grider Moberly, testified in substance the same as the sheriff.

Delmar Tucker testified that the defendant had deliv-
ered four bushels of wheat to him about 8:30 or 9:00
o'clock on Sunday night, the 22d of July, which was de-
livered and accepted in payment of three dollars borrowed
money.

This concluded the evidence for the People, except that
Fred Hudson was recalled and testified that the defendant
had asked him if there was not some way he could settle
the matter.

A brother-in-law of the defendant, Arnold Montooth,
testified that he was in the trucking business, and that on
July 9, 1934, he had purchased seven dollars' worth of
wheat from a feed store in Pana, Illinois, and had deliv-
ered it to the defendant's home. A receipt from the feed
store for the purchase was offered in evidence. This evi-
dence was not controverted.

In his own behalf the defendant testified that he had
purchased the wheat which Montooth delivered to him, had
paid for it, and that some of it was stored in a tin barrel
and some of it in a sack in the hen-house. He testified
that he delivered four bushels of wheat to Tucker in re-
payment of a three-dollar loan; that he took the wheat
which Montooth had bought for him and put it, loose, in
the back end of his car and delivered it to Tucker, who
received it in sacks. He denied stealing any wheat from
the car and any knowledge of the supposed burglary. There
was no other evidence.

It will be observed that the evidence is entirely circumstantial and that there are serious defects in it. No evidence was produced to show any identity or similarity between the tire-tracks found near the box-car and those made by the tires on the defendant's sedan, although such evidence would seem to have been readily available had it existed. According to the People's theory upon the trial, the wheat must have been stolen from the car about dusk, within plain sight of the inhabitants of Cowden, yet no one was called who saw anyone near the car at that time. The defendant's statement that some boys threw wheat at him and that the loose wheat may have gotten into his car that way would appear to be a false statement, and yet it is far from an admission of guilt of the crime of burglary.

A still more serious defect in the People's case is the lack of any positive proof, beyond a reasonable doubt, that any wheat was actually stolen from the car. The mere fact that on Monday morning there appeared to be a hole in the top of what had been left as a smooth mound of wheat on Saturday night was a circumstance tending to show that some wheat had been stolen. It might, however, have been scooped back into the car without the knowledge of the manager of the elevator or it might have been disarranged by boys playing in the car. If stolen, it might have been stolen by someone other than the defendant.

There are circumstances in the record favorable to the defendant. Thus, it is difficult to visualize the means by which wheat could be gotten out of the box-car over a grain door and into the back seat of a sedan with any degree of celerity. It would be a clumsy and awkward operation at best, unless sacks were used, which is contrary to the People's theory. Upon that theory, if this wheat was stolen by the defendant he must have taken it on Sunday evening, while it was still at least partly daylight and in plain view of whoever might be in the village of Cowden.

This would indicate a reckless disregard of consequences hardly compatible with so trivial a theft.

In order to warrant a conviction, circumstantial evidence must be of such a conclusive nature as to lead, on the whole, to a satisfactory conclusion, and such as to produce, in effect, a moral certainty that the accused, and no one else, committed the crime, and it must be such that the circumstances proved cannot, upon any reasonable theory, be true and the defendant innocent. (*Marzen* v. *People,* 173 Ill. 43; *Dunn* v. *People,* 158 id. 586; *People* v. *York,* 262 id. 620; *People* v. *Rischo,* id. 596.) As we pointed out in *Carlton* v. *People,* 150 Ill. 181, and have reiterated in many subsequent cases, it is necessary to establish beyond a reasonable doubt each of two propositions: First, that the crime has actually been committed; and second, that it was committed by the defendant and no one else. In other words, the *corpus delicti* must be proved and the identity of the defendant as the guilty party must be established.

Although we are committed to the doctrine that the jury are the judges of the facts and the weight of the evidence in all criminal cases, yet if a review of the evidence and a consideration of the entire record leaves us with a grave and serious doubt of the guilt of the accused it is our duty to reverse the judgment. (*People* v. *Campagna,* 240 Ill. 378; *Dahlberg* v. *People,* 225 id. 485.) The record before us does little more than raise a suspicion of the defendant's guilt, and the judgment of conviction can not be allowed to stand.

Other errors are urged but need not be considered, as they are not likely to arise upon another trial.

The judgment of the circuit court of Shelby county will be reversed and the cause remanded.

*Reversed and remanded.*