The People of the State of Illinois, Defendant in Error, v. Gustaf Lindquist, Plaintiff in Error.

Gen. No. 38,797.

Opinion

filed March 15, 1937.

GRENVILLE BEARDSLEY, of Chicago, for plaintiff in error.

THOMAS J. COURTNEY, State's Attorney, for defendant in error; EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE and BLAIR L. VARNES, Assistant State's Attorneys, of counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

On December 3, 1934, the grand jury, impaneled in the criminal court of Cook county, returned an indictment against Gustaf Lindquist, Abraham H. Karatz and five others charging that they conspired to obtain notes, mortgages, etc., belonging to the Abraham Lincoln Life Insurance Company, an Illinois corporation, of the value of $13,000,000 by false pretenses and to embezzle $25,000, the property of the insurance company. Lindquist and Karatz were tried together, the jury returned a verdict finding them both guilty, fixed their punishment at imprisonment in the penitentiary, and imposed a fine of $1,000. Afterward judgment was entered on the verdict and Lindquist prosecutes this writ of error. In addition to Lindquist and Karatz the indictment named Hayden Sanders, Otto Van Derck, Dave Barry, Walter Ehlers, Joseph Baiata, otherwise called Charles Carloni, otherwise called J. B. Farquhar, otherwise called Joseph B. Marsino, otherwise called Joseph Marcino, otherwise called Joseph Omar, otherwise called Joseph Omer, otherwise called Harry Goldman, otherwise called Frank Bianco. Just what disposition was made of these five defendants does not clearly appear.

The record discloses that in 1934 Baiata and Karatz were operating a tavern and restaurant on Madison street in the Loop of Chicago, and had employed Barry to "front" for them, thinking that as he had a large following he would bring in considerable business. They also had concessions at the World's Fair on the Lake Front, at which Barry was also employed. The businesses were not a financial success but apparently resulted in losses. Baiata became acquainted with Van Derck, a man about 23 years old, who was employed as a bookkeeper by the Amalgamated Trust & Savings Bank located in downtown Chicago. Van Derck, through his meeting with Baiata, agreed to "pull" checks drawn by the tavern on the bank. The

checks would be paid but when they were returned by the clearing house they were "pulled" by Van Derck and not charged against the account. In this way Van Derck had abstracted from the bank, for the benefit of Baiata, about $30,000 covering a period of a few months. Van Derck was constantly complaining to Baiata that he would pull no more checks, and that unless the defalcations were made up by Baiata, as he had promised, Van Derck would go to the police and confess. The amount embezzled by Van Derck from the bank was constantly increasing until it amounted to about $54,000. About August or September Baiata and Karatz, and probably some others, conceived the idea of getting control of a life insurance company with a view of making good the shortage at the bank from the profits of the insurance company or by abstracting its assets. Karatz had practiced law in St. Paul, Minnesota, for many years, and apparently was then a man of good repute. He had been acquainted with Lindquist for a number of years. About eight years before the indictment Karatz had removed to Chicago where he had been engaged in the insurance, real estate and other businesses.

Baiata had formerly been president of the Commonwealth Insurance Company and chairman of the board of directors of the Niagara Life Insurance Company and had been an officer of several banks. He had served terms in the Federal penitentiary at Atlanta, Georgia, and in the state prison at Charlestown, Mass., and at the time of the trial of the instant case he was brought from the Joliet penitentiary and testified on behalf of the People.

Lindquist was 53 years of age at the time of the trial; he was born in Sweden and had lived in St. Paul since 1901; he first worked as a laborer, went to night school and finally became an insurance salesman, then the proprietor of an agency. He was deputy to the

Hon. John B. Sanborn, then Commissioner of Insurance and now Judge of the United States Circuit Court of Appeals. In 1917 Lindquist was secretary to Gov. J. A. Burnquist of Minnesota, who in 1920 appointed him Commissioner of Insurance of that State. He was reappointed by Gov. Preus of Minnesota. He afterward resigned as Commissioner of Insurance to become president of the Travellers Equitable Insurance Co. of Minneapolis, which position he retained until 1930, at which time he became an assistant to the vice-president of the Equitable Insurance Company of New York; he later organized a company known as the Pioneer Mutual Life Insurance Company of Minnesota, of which he was president in September, 1934. As president of the Travellers Insurance Company his salary was $12,000 a year and the Equitable Insurance Company of New York paid $10,000 a year. In September, 1934, he was earning about $50 a week with commissions.

In the early part of September, 1934, Baiata went to St. Paul, apparently on some business, and dropped in to see Lindquist at the latter's office; this was apparently the first time Lindquist had seen or heard of Baiata. Baiata told him that he and their mutual friend, Karatz, were contemplating buying a life insurance company and that they wanted an outstanding man in that line to take charge of the company, and Baiata mentioned a life insurance company of Springfield, Illinois. Lindquist said he had heard of that company through Karatz and had looked into its affairs but would not care to be connected with it. At that time Baiata said he had considerable money—represented considerable wealth—and that if he decided to buy a life insurance company he could obtain $1,000,000 for that purpose.

Robert Telfer, an insurance broker of Chicago who had been an official of Baiata's former Commonwealth

Insurance Company, was looking for an insurance company which Baiata and Karatz might buy. Karatz from Chicago wrote to Lindquist calling his attention to the life insurance company of Springfield above referred to; Lindquist declined the proposition for the reason that he thought the company was not a good one. During the latter part of September, 1934, Telfer from Chicago called up Cornelius J. Doyle of Springfield, Illinois, who was a prominent attorney and well known in insurance circles, and inquired about the purchase of an insurance company and the Abraham Lincoln Company of Springfield was mentioned. Pursuant to this talk Baiata and Karatz went to Springfield and had a conference with Doyle and officials of the Abraham Lincoln Insurance Company; it was there stated that Lindquist was to be the president of the company in case the controlling interest should be purchased by Baiata and Karatz. The president of the company stated he wanted to deal with the principal and thereupon Doyle, from Springfield, called Lindquist at his home in St. Paul on the telephone, the number having been given to him by Karatz. Doyle explained the matter and as a result Lindquist arrived in Springfield the next day and after a few days' investigation of the Lincoln Company and after conferences with the company's officials a written contract was entered into on September 29th between the officials of the Abraham Lincoln Company and Lindquist for the sale of about 53 per cent of the capital stock to Lindquist for about $400,000; $10,000 was paid at the time, checks for this amount being there furnished by Baiata, and $15,000 was paid shortly thereafter, the money also being furnished by Baiata. Further payments of $25,000 a month were to be made.

The Abraham Lincoln Insurance Company had been having difficulties with the Insurance Department of Illinois. A few months prior to September an agree-

ment to sell the controlling interest in the company to some parties from Kansas City had resulted in objections by the Insurance Commissioner who refused to approve the contract for the sale and the deal fell through. The Commissioner had his representative in the office of the insurance company to see that the policyholders were protected; but the Commissioner was not advised of the contract of September 29th until October 15th. Pursuant to the terms of the contract, some of the officials and the officers of the insurance company resigned and Lindquist was elected president and director, and Sanders, named in the indictment, was elected treasurer. When the Insurance Commissioner learned of the sale to Lindquist he sent for him and the officials of the company. They went to his office and he told them he would not approve the contract, pointing out several objections. He stated that the officials of the company had promised him, after the failure of the sale to the Kansas City parties, that they would take no other action in the matter without securing his approval. He demanded the names of the persons who were to put up the money for the purchase of the controlling interest and afterward wrote Lindquist calling for this and other information. Lindquist wrote in reply, naming six men who were to be associated with him in the transaction, giving their names and addresses, five of whom lived in St. Paul and one in Minneapolis, Minn. Upon receipt of this letter the Insurance Commissioner wrote these six men advising them of the contract entered into by Lindquist and the officials of the insurance company, stating that Lindquist had advised him that they were to purchase some of the stock of the company and requesting them to advise him as to what amounts they were investing in the company and to attend a meeting in Springfield at the Commissioner's office on October 31. Four of the six persons replied

to the Commissioner's letter but none of them said they were to be financially interested in the company, and each stated he could not attend the meeting of October 31. The Commissioner received no reply from the other two men.

November 1, 1934, the officials of the insurance company entered into another agreement with Lindquist whereby they were to sell him about 53 per cent of the capital stock of the company. This agreement was approved by the Commissioner. It provided, among other things, that Lindquist was to substitute in the portfolio of the insurance company cash or securities of sound value amounting to $307,350, in payment of 4,098 shares of the preferred stock of the Abraham Lincoln Hotel Company of Springfield, Illinois, to which the Insurance Commissioner had objected and insisted that this hotel stock be removed from the assets of the insurance company.

The Insurance Commissioner continued to have his representative in the offices of the insurance company to keep him advised as to what was being done so that the policyholders would be protected. Shortly after the agreement of September 29th was entered into between the officials of the insurance company and Lindquist, Baiata, Karatz and Lindquist entered into a written agreement whereby Baiata and Karatz were each to receive 42 5/10 per cent and Lindquist 15 per cent of the 53 per cent of the capital stock of the insurance company.

Shortly before the instalment for $25,000 fell due on November 15th, Baiata was having trouble in raising the money with which to pay this instalment, and the idea was conceived of buying the controlling interest in a bank in Indianapolis with a view of looting the bank to the extent necessary to make the payment; for this purpose Baiata, Karatz, Ehlers and Sanders went to Indianapolis, and on November 9th a written agree-

ment was entered into between Sexton, president of the bank, and Ehlers and Sanders, whereby Sexton agreed to sell and deliver to them 510 shares of the capital stock of the bank for $165 a share, or a total of $84,150, to be paid for in cash or its equivalent. This was the controlling interest in the bank. The agreement provided that upon the consummation of the deal certain officers and directors of the bank were to resign and Ehlers was to be elected a director and vice president of the bank and Sanders was to be elected a director and president of the bank. It was agreed that it would take from 10 to 15 days for Sexton to secure the necessary number of shares of stock.

Apparently Baiata and some of the others were fearful that the $25,000 instalment might not be paid when due, and the deal might fail through the action of the Insurance Commissioner of Illinois. About this time the insurance company deposited money in the Amalgamated Trust & Savings Bank of Chicago. Afterward the insurance company caused some of its checks to be printed at Springfield to be thereafter drawn on the Amalgamated Bank. Karatz went to Springfield from Chicago and registered at the St. Nicholas Hotel under the name of A. Kahn, claiming he did so because he did not want other parties with whom he had been negotiating in other business transactions to know he was in Springfield.

At Springfield on November 13th a check was drawn by the Abraham Lincoln Life Insurance Company on the Amalgamated Bank for $25,000, payable to Ehlers, which was signed by Sanders as treasurer and countersigned by Lindquist as president of the insurance company. This check was given to Karatz at the St. Nicholas Hotel. The check states on its face that is for "Purchase 32M. La. Port Comm. 5% bonds." It was brought from Springfield by Karatz and given to Ehlers in Chicago. Ehlers took the check to the Amal-

gamated Bank and received for it a cashier's check of the Amalgamated Bank dated November 14th for $25,000, payable to Ehlers and drawn on the First National Bank of Chicago. Ehlers presented this check to the First National Bank and it was certified by the bank.

About that time Karatz's father, who lived in Minneapolis, died and Karatz and his son went to that city to attend the funeral. While he was there Baiata took the check to the First National Bank to Minneapolis and delivered it to Karatz's son, who, pursuant to his father's direction, took the check and delivered it to attorney Scott, apparently to have the check cashed. Scott was unable to do this, and the check was then delivered to Harry A. Weiss, a practicing lawyer in St. Paul. Weiss apparently deposited the check in his bank there, but the First National Bank of Chicago refused to pay the check because the payee, Ehlers, was not identified. Lindquist learning, as he says, that the check was in St. Paul, went there, got the check, came back to Chicago and proceeded with Ehlers to the Amalgamated Bank where it was to be redeposited to the account of the insurance company in that bank. When Ehlers went into the bank he was placed under arrest. Karatz and Baiata had been arrested the evening before; Van Derck, who had been looting the funds of the Amalgamated Bank as above stated, having gone to the officers and told them the story of his embezzlement. The next day Lindquist went to the State's attorney's office, where he was interrogated about the matter.

Counsel for Lindquist contends that the evidence is insufficient to prove his guilt beyond a reasonable doubt and therefore the judgment cannot stand. In support of this, counsel says that a great part of the evidence against Lindquist was the testimony of Baiata, the chief actor in the instant case, a self-con-

fessed criminal whose criminality had extended over a period of years and that the law caught up with him sufficiently to cause his confinement in prisons in Atlanta, Charlestown, Mass., and Joliet, Ill., where he was serving a sentence at the time he testified. Baiata also admitted his guilt in the instant case, but what disposition was made of him does not appear. Baiata was known by eight aliases and apparently his chief vocation was defrauding persons of their property and corrupting young and old with whom he came in contact.

Baiata's testimony is to the effect that on November 3, 1934, he told Lindquist in Karatz's presence that Van Derck had stolen money from the bank and that it was "our business" to replace the money and save Van Derck and "ourselves." This is the earliest date at which the evidence tends to connect Lindquist with knowledge of the crooked business in which Baiata and others were engaged in looting the bank and procuring the insurance company for the same purpose. And it was only 16 days thereafter that Van Derck went to the police and the arrests followed.

There is some other evidence that Lindquist knew that Sanders on November 8th was taking $80,000 worth of securities belonging to the insurance company to Indianapolis to be used toward the purchase of a bank in that city. Sanders so testified. He also gave testimony to the effect that Lindquist knew of and took an active part in making out the check of November 13, for $25,000, drawn on the insurance company's account in the Amalgamated Bank of Chicago in an endeavor to obtain $25,000 of the insurance company's money to be used in paying the November instalment of $25,000 on the contract for the purchase by Lindquist of 53 per cent of the capital stock of the insurance company.

The contention of the People that Lindquist had surreptitiously taken the blank check from those then being printed in Springfield, before they were assembled in book form, is in some measure supported by the testimony of witnesses who were not accomplices, to the effect that at the time in question Lindquist was seen looking over the printed proofs of the blank checks in the printing plant and that the check in the record is No. 2, while a similar number also appears in the checkbook that was afterward made up.

Counsel for the People also contend that after this check was signed by Sanders and Lindquist in Springfield it was sent to Chicago, and Ehlers and the other conspirators being unable to obtain the money on it in Chicago sent it to Minneapolis for the purpose of having it cashed there and the money forwarded from St. Paul to Springfield so as to make it appear that Lindquist's friends there were furnishing money, as he had theretofore told the Insurance Commissioner of Illinois would be done; that the evidence shows Lindquist actively participated in an endeavor to wrongfully obtain the $25,000, and that this evidence, together with other evidence in the record, warranted the jury in finding him guilty beyond a reasonable doubt on this phase of the case.

Lindquist denied any wrongdoing; he testified that he understood the entire transaction, from its inception until just before Ehlers was arrested, was legitimate in every way and that he first became suspicious when he learned that the $25,000 check was in St. Paul. He further testified that the $25,000 check was brought to him by Sanders in Springfield, having theretofore been filled out by Sanders; that the check on its face showed that the $25,000 was to be used to purchase $32,000 worth of Louisiana Port bonds which Sanders said he had bought for the insurance company and which he said would result in a profit of $7,500 to the

insurance company; that Sanders said the bonds had been purchased from Ehlers in Chicago and the check was to be sent to Ehlers in payment of the bonds, and that Sanders said he was going to obtain the Insurance Commissioner's approval, which he was certain would be forthcoming because of the profit that would be made for the insurance company in the transaction.

Lindquist further testified that throughout the dealings he had no notice, knowledge or intimation that Van Derck was stealing from the bank the money Baiata had used in part payment for the purchase of the controlling interest in the insurance company.

The evidence is voluminous (consisting of about 2,300 pages) much of which we do not discuss in detail in this opinion.

The evidence shows that Lindquist was a man of good standing in Minnesota where he had resided practically all his life, during a great many years of which he was engaged in the insurance business as Commissioner of Insurance or in connection with the operation of other insurance companies. Thirteen witnesses came from Minnesota and testified that they had known Lindquist as a citizen of Minnesota for a great many years and that his general reputation for honesty, integrity and square dealing was good. Some of these witnesses were business men, some clergymen, all of them men of high standing. Nor is there any contention by counsel for the People that Lindquist's reputation was not as testified to by these witnesses. Lindquist did conceal from the Insurance Commissioner of Illinois that the man who was to put up the money for the purchase of the stock of the insurance company was Baiata, but on the contrary let the Commissioner believe that he was being backed financially by men from Minnesota. He attempts to explain this by the fact that the officials of the insurance company had theretofore had difficulties with the

Insurance Commissioner, and that through their suggestion he referred the Commissioner to the six citizens of Minnesota, and did not name Baiata as the real purchaser of the stock. The evidence shows further that although the Commissioner wrote to the six citizens of Minnesota (to whom Lindquist had referred as the persons who were to be interested financially in the insurance company) and although four of them replied that they would not be interested in it in a financial way, yet the Commissioner apparently had such confidence in Lindquist (knowing him by reputation) that he approved the contract of November 1 for the purchase of the controlling interest in the insurance company.

Lindquist, as the evidence all shows, was a man of standing and it seems incredible that he would be the principal actor in obtaining control of the insurance company with funds that were being stolen from the Amalgamated Bank by the young man, Van Derck, employed by that bank, through the suggestion and connivance of the criminal, Baiata. It is also, we think, incredible that Lindquist would be one of the chief actors in obtaining $25,000 of the insurance company's money from the Amalgamated Bank to make a payment of that sum on the contract of November 1. We think there could be no possibility of this fraud not becoming known, which of course would subject Lindquist to prosecution and the penalty imposed by law. We think it likewise incredible that Lindquist would take part in a crooked deal involving the attempted purchase of the Indianapolis bank whereby the funds of that bank were intended to be abstracted by Baiata to pay for the insurance company stock. Most of the damaging evidence against Lindquist is given by accomplices.

In *People v. Vehon,* 340 Ill. 511, and *People v. Semenick,* 360 Ill. 250, it was held that in a conviction of one

of a crime where the evidence is so unreasonable or improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt, it is the duty of a court of review to reverse the judgment. It is also the law that where one view of the evidence may be reasonably reconciled with the innocence of the defendant rather than with his guilt, a conviction cannot be sustained. *People v. Oberlin,* 355 Ill. 317.

In *People v. Buchholz,* 363 Ill. 270, the court, in reversing a judgment of conviction said (p. 278): ''While evidence of good reputation is not proof of innocence it is not to be disregarded, and it may be sufficient to raise a reasonable doubt as to defendant's guilt. In the present case the defendant's good reputation stands uncontroverted and must be accorded some consideration and weight.''

Upon a careful consideration of all the evidence in the record, we are of opinion that it is insufficient to prove Lindquist's guilt beyond a reasonable doubt. From what we have said the judgment would have to be reversed and the cause remanded, but counsel for defendant says that since the indictment is invalid by reason of the illegality of the grand jury, the judgment should be reversed and the cause not remanded.

At the proper time the defendant made a motion to quash the indictment on the ground that the grand jury was illegally constituted because the record of the criminal court of Cook county shows the chief justice of that court ordered the clerk of the court to repair to the office of the jury commissioners and draw from the grand jury box the names of 23 qualified persons for grand jury service, and that the sheriff summon them to appear; that the names were so drawn and the sheriff performed his duty; that 18 of the 23 responded, 2 of whom were excused by the chief justice, leaving 16 of the panel; that thereupon the chief justice entered an order that the sheriff go into the body of

the county and summon seven additional men having the statutory qualifications as found in the Jurors Act, which was done. Counsel contends that the names of the seven men should have been drawn by the clerk from the jury commissioners' list, as required by section 9 of the Jury Commissioners Act (ch. 78, ¶ 34, Ill. State Bar Stats. 1935; Jones Ill. Stats. Ann. 107.255; Smith-Hurd Ill. Rev. Stats. 1935, ch. 78, ¶ 32). That section provides that when jurors are needed, one or more of the judges of the court shall "certify to the clerk of the court the number of petit jurors required each month. The clerk shall then repair to the office of the jury commissioners and there, in the presence of the persons mentioned in section 8 of this Act, proceed to draw by lot the necessary number of names from those made available for such drawing as in section 8 of this Act provided. The clerk shall thereupon certify to the sheriff the electors whose names are so drawn, to be summoned according to law. If more jurors are needed during the month, a judge of the court shall so certify, and they shall be drawn and certified forthwith in the manner above provided. Whenever a grand jury is required by law or by order of the court, it shall be drawn and certified in like manner." This section was in effect in 1931.

On the other hand, the State's attorney's position is that section 9, from which we have just quoted, was repealed by implication in 1933, when the legislature amended section 9 of the Jurors Act. (Ch. 78, sec. 9, p. 1723, Cahill's 1933 Stats.) Section 9 was amended June 21, 1933, and went into effect January 1, 1934. It provided that "If a grand jury is required by law or by the order of the judge for any court, the county board in each of the counties of this State . . . at least twenty days before the time of appearance specified in the summons hereinafter mentioned shall select twenty-three persons possessing the qualifications pro-

vided in section 2, of this Act, . . . and cause their clerk within five days thereafter, to certify the names of the persons so selected as grand jurors to the clerk of the court for which they are selected, who shall issue and deliver to the sheriff . . . a summons commanding him to summon the persons so selected . . . to appear before such court . . . to constitute a grand jury in the Circuit Courts and in the Criminal Court of Cook County for the term for which they are summoned, . . . If for any reason the panel of grand jurors shall not be full at the opening of such court, the judge shall direct the sheriff to summon from the body of the county a sufficient number of persons having the qualifications of jurors, as provided by this Act, to fill the panel.'' That section expressly provided that the drawing of grand jurors throughout the State, including the criminal court of Cook county, should be by the county board of each county and if the 23 men summoned did not all respond at the opening of court, the judge should direct the sheriff to summon, from the body of the county, a sufficient number of persons to fill the panel of 23. There was a conflict between that section, which went into effect January 1, 1934, and section 9 and other sections of the Jury Commissioners Act of 1931; and to obviate this conflict the legislature on April 26, 1934, again amended section 9 of the Jurors Act, eliminating the criminal court of Cook county from the body of that section and adding the following proviso: ''*Provided,* that nothing in this Act relating to the selecting of the grand jury shall apply to counties of more than 250,000 inhabitants.''

The State's attorney's position is that the provision of section 9 of the Jury Commissioners Act of 1931, being in conflict with section 9 of the Jurors Act which became effective January 1, 1934, was by implication repealed and that section 9 of the Jury Commissioners

Act of 1931 was not thereafter revived and made effective by the amendment of section 9 of the Jurors Act on April 26, 1934; that section 9 of the Jury Commissioners Act of 1931, having been repealed by implication, and thereafter section 9 of the Jurors Act so amended as not to apply to Cook county, there is no statute for impaneling a grand jury in Cook county, and that the only law applicable to Cook county for the summoning of a grand jury is the common law, viz., that the sheriff go into the body of the county and summon all of the grand jurors.

In the instant case the original 23 grand jurors were summoned in accordance with the provisions of the Jury Commissioners Act which we hold is effective in Cook county. The panel not having been filled, the seven additional names should have been summoned in accordance with the provisions of section 9 of the Jury Commissioners Act.

In *People v. Sweitzer,* 266 Ill. 459, the court said (p. 475): ''The nomination of candidates for such offices was by such repeal again brought under the operation of the Ballot Act of 1891, under the provisions of which such nominations had been made prior to the enactment of the Primary Election Act of 1910, and this notwithstanding the provision of section 3 of chapter 131 of Hurd's Statutes of 1913, that 'no act or part of an act repealed by the General Assembly shall be deemed to be revived by the repeal of the repealing act.' That provision has no application where the effect of an act is not to entirely abrogate a former act, but merely to withdraw from the operation of the earlier act a portion of the cases included within its terms, leaving the earlier act still in force except as to the cases specifically provided by the later one. Under such circumstances the repeal of the later act has the effect of again bringing the cases provided for by it under the operation of the original act.'' Citing 26

Amer. & Eng. Ency. of Law, 761; *Smith v. Hoyt,* 14 Wis. 252; *State v. Sawell,* 107 Wis. 300; *State v. Mines,* 38 W. Va. 125; *Dykstra v. Holden,* 151 Mich. 289, and *State v. Prather,* 84 Kan. 169. The court there continues discussing the cases just cited to sustain the rule just quoted.

In the instant case, we are of opinion that under the rule announced in the *Sweitzer* case, section 9 of the Jury Commissioners Act of 1931 with reference to the impaneling of a grand jury was not repealed but "merely suspended and superseded" by the amendment of section 9 of the Jurors Act of 1933, which by express terms applied to the impaneling of a grand jury throughout the State, including the criminal court of Cook county, and when the criminal court of Cook county was on April 26, 1934, eliminated by the legislature the suspension of section 9 of the Jury Commissioners Act of 1931 no longer obtained, and that section again became effective. The provisions of that section not having been followed in the selection of the additional seven grand jurors, we hold that the grand jury was not legally constituted, and that the motion to quash should have been sustained.

But the State's attorney further contends that under the rule announced by the Supreme Court in *People v. Lieber,* 357 Ill. 423, the defendant is not in a position to complain because it was there held that the provisions of the statute concerning the manner of selecting grand jurors was directory and not mandatory; and that as said in the *Lieber* case (p. 436): "The reason of this rule is that the grand jurors do not try the case but merely charge the accused. The manner of their selection is of no consequence to him, he being entitled to claim only fair and impartial grand jurors who possess the necessary qualifications, whereas it is of great consequence that the administration of justice shall not be delayed by mere technical

objections. Such statutes need not be followed with technical or literal strictness. A substantial compliance is all that is required, and mere irregularities in the drawing and selection do not invalidate the grand jury's action.'' In the *Lieber* case the court ordered that 60 persons be summoned for grand jury service; 56 responded and 23 were selected from those persons. The names of the 60 persons were drawn by the jury commissioners as required by the Jury Commissioners Act, and it was held that the proper method to be followed under the statute was to summon but 23 in the first instance, and if that number did not report additional names should be drawn in the same manner by the jury commissioners until the panel was filled; that the irregularity did not render the grand jury which returned the indictment illegal.

But in the instant case the seven men were not drawn by the jury commissioners in the manner required by the statute but were selected from the body of the county by the sheriff. In *People v. Clampitt,* 362 Ill. 534, where petit jurors were summoned by the coroner instead of by the sheriff, it was held that a challenge to the array should have been sustained although the defendant did not show that he was prejudiced. The court there said (p. 537): ''Where no attempt is made to comply with the legal method provided for summoning jurors, a challenge to the array must be sustained even though no prejudice is shown. (*Jeople v. Mankus,* 292 Ill. 435; *People v. Fudge,* 342 id. 574.)''

In the *Mankus* case (292 Ill. 435) an information was filed charging defendants with selling intoxicating liquor within anti-saloon territory. The case was taken to the Supreme Court where the judgment was reversed and the cause remanded. The county court there appointed a special bailiff in all criminal cases to act in lieu of the sheriff on the ground that the

sheriff was interested in the prosecution of the case. The special bailiff summoned the jurors and a motion was made to quash the venire and the return on the ground that the court had no authority to appoint the special bailiff. The motion was overruled and then defendants challenged the array. The court there said (p. 438): "The common law powers of courts to provide juries is subordinate to the methods expressly provided by statute, and where there is such a statute it is not to be departed from but must be substantially complied with. (*Healy v. People,* 177 Ill. 306.) While it has been often held that such statutes are directory, that a substantial compliance with their requirements is sufficient and that a mere irregularity will not be fatal, that is only so where an attempt has been made to follow the statute and there has been some irregularity in doing so. . . . Here no attempt was made to get a jury by either of the methods provided by section 110, but the jury was drawn and summoned in a manner not mentioned or referred to by the statute."

In the instant case no attempt was made to comply with the legal method provided for summoning grand jurors and the motion to quash the indictment should have been sustained.

The judgment of the criminal court of Cook county is reversed.

*Judgment reversed.*

Matchett, P. J., and McSurely, J., concur.