THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES FURBY et al., Defendants-Appellants.

Second District  Nos. 2—87—1100, 2—87—1101 cons.

Opinion filed April 21, 1989.

M. Jacqueline Walther, of Kielian & Walther, and George Patrick Lynch, Ltd., both of Chicago (George P. Lynch, of counsel), for appellants.

James E. Ryan, State's Attorney, of Wheaton, and Kevin T. McClain, of Immel, Zelle, Ogren, McClain, Germeraad & Costello, of Springfield (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Following a jury trial, the defendants, James and Thomas Furby, were found guilty of theft in excess of $300 (Ill. Rev. Stat. 1985, ch.

38, par. 16—1(a)). Each defendant was sentenced to 24 months' probation, ordered to perform 50 hours of public service employment, and held jointly and severally liable to pay restitution in the amount of $1,177.56. Both defendants appeal from their convictions.

At trial, the witnesses testified as follows. James Lawson, the complaining witness, testified that on November 7, 1985, he and his partner, Vincent Valentino, owned a restaurant known as Vincenzo's Pizza & Pasta Restaurant. Michael Phillips was employed as the manager. The defendants were employed as pizza deliverymen and had worked for Lawson since August 1985.

Upon the closing of the restaurant each night, Lawson would take home the day's receipts, leaving the petty cash in the cash drawer. Although Lawson usually closed the restaurant at night, on November 7, 1985, he left the restaurant between 2 p.m. and 3 p.m. and did not return until the next morning. Phillips was in charge of closing the restaurant and handling the cash. Phillips was to take the cash receipts and lock them in the cash drawer in Lawson's office, which was in the back of the restaurant. Lawson generally kept about $300 in petty cash in the upper right-hand drawer of his desk. He also kept his business checkbook and payroll disbursement book in the same drawer. The door to the office was normally locked. When Lawson left the restaurant on November 7, 1985, everything was in its place in his office. The back door to the building was in good condition.

At 8 a.m. on November 8, 1985, Lawson entered the restaurant by the front door. While everything in front appeared to be in order, Lawson discovered the door to his office ajar, and that the back door to the building had jimmy marks on it which had not previously been there, and the door had been pried in half. Lawson then observed that the lock on the cash drawer had been pulled off. The drawers on the right-hand side of the desk were empty, but the drawer on the left side of the desk as well as the filing cabinet did not appear to have been touched. The business checkbook was missing, as was the payroll book, which was later found in a dumpster in the alley. Over defense objection, Lawson testified that the register tape showed that $658 should have been in the cash drawer, in addition to the petty cash. Nothing was left in the cash drawer except the cash register receipt.

Lawson further testified that he would make cash disbursements to his employees in his office, and consequently, employees would be present in his office when the cash drawer was open because the office was adjacent to the kitchen. Both defendants had been present on occasions when Lawson would take cash out of the register and place it in the cash drawer in his office. Although at various times both

defendants had been given permission to remove money from the cash drawer, neither of them had permission to do so on November 7, 1985.

On cross-examination, Lawson testified that in addition to Phillips and the defendants, there were three other persons employed at the restaurant. Although Lawson signed a complaint charging the defendants with theft on February 3, 1986, he continued to employ both defendants, as well as Michael Phillips. Although James Furby ceased working for Lawson immediately after the warrant for his arrest was issued, he left of his own accord. Michael Phillips (who was interviewed by police but apparently never charged) left a short while after James Furby. Thomas Furby continued to work for Lawson until August 1986. Lawson continued to entrust money to Thomas to make change with on his pizza delivery route. Lawson stated on redirect examination that after the instant charges had been filed, he watched the money he entrusted Thomas with very closely.

On inquiry by the trial judge, Lawson testified that on November 7, 1985, he had just under $200 in the petty cash plus another $200 in coin and currency which, together with the amount on the register receipt, made a total of approximately $1,058 which should have been in the cash drawer.

Officer Michael Riddle of the Downers Grove police department testified on behalf of the State as follows. On November 8, 1985, at approximately 8:39 a.m., he was dispatched to investigate a complaint of a suspected burglary at Vincenzo's Pizza & Pasta Restaurant in Downers Grove. Upon his arrival at the restaurant, he met the owner, James Lawson. Officer Riddle observed that the rear door had jimmy marks on it and a slide lock nailed to a piece of wood was broken. In Lawson's office, Riddle observed that the padlock on the upper right desk drawer was broken off and the drawer was open on the right side of the desk, though not on the left. Lawson advised him that all the money was kept on the right side of the desk, and it was all missing. Also missing were the payroll checks and other checks used in the business, along with a roll of coins. Officer Riddle located the payroll book in a dumpster in the alley to the rear of the building. When Officer Riddle inquired as to how much money had been taken, Lawson estimated about $800. He was not sure whether a money drop had been made or if his wife had taken home some of the money.

On cross-examination, Officer Riddle testified that Officer Karmia, an evidence technician, arrived on the scene at his request. Officer Karmia was responsible for lifting any fingerprints or footprints at the scene and for photographing the scene. Officer Riddle did not re-

call if any photographs of the scene were taken. He was aware that Officer Karmia dusted for fingerprints, but he could not recall if any fingerprints were lifted from anything or not. Officer Riddle could not recall if any footprints were taken from the paper strewn on the floor, although one check was taken to have fingerprints lifted from later. Officer Riddle stated there were footprints outside the back door which he believed were photographed by Officer Karmia.

Sergeant Byrne of the Downers Grove police department testified for the State as follows. While a detective, he was assigned to investigate a burglary that occurred at Vincenzo's Pizza Parlor. On December 19, 1985, he conducted an interview with defendant James Furby at the Downers Grove police department. Detective Reinhart was also present during the interview. Byrne advised James that he wished to speak to him about the incident at Vincenzo's restaurant. He further advised James that he was not under arrest and was free to leave at any time. According to Byrne, James indicated that he was willing to speak to the two police officers.

James related to Byrne and Reinhart that on the night of November 7, 1985, he, his brother Thomas, and Michael Phillips had devised a plan to stage a burglary at Vincenzo's and take the day's cash receipts from the cash drawer. James obtained a crowbar and put pry marks on the back door to make it look as though someone had pried the back door. Phillips then took the crowbar and pried open the drawer of the desk where the cash was kept. James threw paper and some checks around to make it look as though a burglary had actually occurred. He also threw a book of business checks into the dumpster. After Phillips removed the money from the cash drawer, James, Thomas, and Phillips went to Phillips' apartment in Woodridge, where they divided up the money. The money was divided up evenly, and James received somewhere between $175 and $180.

James then inquired whether it would be possible to make restitution to the restaurant. After Byrne told him he would look into that possibility, the interview was terminated, and James left the police department. Byrne denied supplying any of the specifics of the burglary to James prior to the interview.

Byrne also interviewed Thomas Furby in connection with his investigation of the burglary at Vincenzo's at the Downers Grove police station. Detective Kirk Schwebe was also present during the interview. Byrne administered *Miranda* warnings to Thomas, who indicated that he understood them and that he was willing to speak to the police officers.

Thomas related that on November 7, 1985, he had left Vincenzo's

shortly after 11 p.m. He returned to the restaurant with his brother James sometime around midnight. He was aware that Phillips and James had devised a plan to take money from the restaurant. When James and he arrived at the restaurant, he stood in an alley to the rear of the business while Phillips and James went inside the restaurant. He stood outside the restaurant for 5 to 10 minutes, at which point Phillips and James exited the restaurant, one by the front door, the other by the back door. All three men then went to Phillips' apartment in Woodridge, where they divided up the money equally. Thomas was not certain of the exact figure, but it was between $150 and $200. Thomas was given the money to keep quiet about the incident. In response to a question by Byrne, Thomas indicated that he would be willing to make restitution of the money he received.

On cross-examination, Byrne testified that no written or taped statements were taken from either of the defendants. Although Byrne was aware that footprint impressions had been taken, no comparison with the defendants' footwear or those of the other restaurant employees were made.

Sergeant Kirk Schwebe of the Downers Grove police department testified on behalf of the State. On December 27, 1985, while a detective, he was present at an interview with defendant, Thomas Furby. Schwebe confirmed the testimony of Byrne as to the statements made by Thomas during that interview. On cross-examination, Schwebe admitted that he had not prepared a report of the interview but had reviewed Sergeant Byrne's report prior to testifying. On redirect examination, Schwebe stated that he had an independent recollection of the interview. On re-cross, Schwebe stated that in the intervening months, he had interviewed approximately 100 witnesses. Detective Reinhart was not called to testify.

James Furby testified on his own behalf. Sometime in July or August 1985, he began working at Lawson's restaurant. He left in June or July 1986 because he lost his driver's license. While he was employed by Lawson, he delivered pizzas. He was given anything from $20 to $150 depending on how busy they were. Out of that, he paid for each pizza to be delivered, and then he would collect the money from the customers when he delivered the pizzas. The cashier would make sure the correct amount was turned in. Although he was arrested and charged in connection with the incident at the restaurant, his duties at the restaurant did not change.

James learned about the theft or burglary at the restaurant when he arrived at work the next day. Sometime later Detective Byrne came to his house and asked both defendants if they would be willing

to answer questions at the police department. James voluntarily appeared at the Downers Grove police station where he was interviewed by Detectives Byrne and Reinhart. Byrne maintained that he had evidence proving James guilty and that he should confess. James told him he did not know what he was talking about. Byrne insisted that he had evidence against James and would throw him in jail, so he should just confess. James stated that he only worked there and knew nothing about the incident. James finally told Byrne to either arrest him, or he was going home. Byrne allowed him to go home.

James testified further that Detective Byrne never requested him to make a written statement. Further, James denied stealing money from Lawson and testified that Detective Byrne's recitation of James' statement was not true.

On cross-examination, James testified that he knew that Lawson kept money somewhere in the drawer of his desk. He received cash payments from Lawson either in his office or in the cash register. He believed it was in the top right-hand drawer of the desk. After he was charged in connection with the incident, he was left alone in the office on a couple of occasions. He was never responsible for the closing of the business at night.

James stated that he was not working the night of November 7, 1985. He was at the restaurant between 9:15 p.m. and 10 p.m. to get something to eat and wait for his brother and Mike Phillips to finish up work because they were all going out together that evening.

Thomas Furby testified on his own behalf. In August 1985, he was employed by Lawson at Vincenzo's pizzeria. He left Lawson's employ in August 1986.

While he worked at the pizzeria, he was a delivery person. As part of his job, he was entrusted with money by Lawson. His duties did not change after he was arrested and charged in connection with this incident.

On December 27, 1985, he was interviewed by Detective Byrne at the Downers Grove police department. Detective Schwebe was also present during the interview. Byrne informed him that James had already confessed, that there were witnesses who had seen them committing the theft, and that he should confess and make it easy on himself. Thomas denied making the statements attributed to him by Detective Byrne. Further, he denied taking any money from his employer.

On cross-examination, Thomas testified that on November 7, 1985, he left the pizza parlor at approximately 10 p.m. His brother James was there and so was Mike Phillips, who was working. He did

not recall telling Detectives Byrne or Schwebe that all three were working that night. He denied telling Detective Byrne that he returned to the pizza parlor after midnight; in fact, he had told him he had not returned to the pizza parlor that night. Thomas denied making the remarks the statement attributed to him by Detective Byrne. Detective Byrne asked him if he would sign a written statement. Since he was not guilty, he told Detective Byrne that he would not sign a confession.

According to Thomas, Lawson would pay him from the register, or if he was carrying the proceeds back to his office, he would pay him from there. Thomas did not recall him taking the cash drawer and putting it inside his desk. He did not know whether Lawson kept money in any of the other drawers.

The jury returned a verdict of guilty of theft over $300 as to both defendants, and they were sentenced as stated above. This appeal followed.

Defendants contend that the State failed to establish the *corpus delicti* beyond a reasonable doubt. Defendants maintain that other than their purported confessions, the State's evidence failed to link them to the theft, and further, the State failed to prove that a theft actually took place.

In *People v. Lambert* (1984), 104 Ill. 2d 375, 378-79, our supreme court stated as follows:

"The issue presented is whether the State proved the *corpus delicti* of the offense charged. In *People v. Kirilenko* (1953), 1 Ill. 2d 90, 94, this court stated:

'It is a basic concept in criminal law that proof of a criminal offense involves the proof of two distinct propositions or facts beyond a reasonable doubt. First, that a crime was committed, and second, that it was committed by the person or persons charged. In other words, as stated in *People v. Hooper*, 364 Ill. 320, "the *corpus delicti* must be proved and the identity of the defendant as the guilty party must be established." '

'Proof of *corpus delicti* requires both proof of injury or loss, as well as proof of criminal agency. ***' [Citation.] However, the *corpus delicti* cannot be proved by the defendant's confession alone. [Citations.] There must be either some independent evidence or corroborating evidence outside of the confession which tends to establish that a crime occurred. [Citation.] If there is such evidence, and that evidence tends to prove that the offense occurred, then that evidence, if it corroborates the

facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*."

In *People v. Lambert*, the defendant there was convicted of indecent liberties with a four-year-old child. The evidence against defendant consisted of defendant's confession and the testimony of the victim's mother and a police officer, which established that the defendant and the victim had been in the basement together on the night the alleged incident took place, and two to three weeks after that night, the victim's rectum appeared pink and swollen. In upholding the reversal of the defendant's conviction by the appellate court, the supreme court noted that the State had failed to present medical testimony to establish the possible causes of the victim's condition, and thus failed to establish any relationship between the victim's condition when the injury was discovered and the cause of the crime, which was alleged to have occurred on an earlier date.

■ The defendants in this case were charged with the offense of theft in excess of $300. "A person commits theft when he knowingly obtains or exerts unauthorized control over property of the owner and intends to deprive the owner permanently of the use or benefit of the property." (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(a).) Thus, the State was required to prove that the taking was unauthorized and that defendants had done the taking.

Relying on *People v. Lambert*, defendants argue, first, that the State failed to prove that a crime had been committed. The State's evidence independent of the defendants' alleged confessions was as follows: the office at Vincenzo's had been rummaged through prior to Lawson's return to the restaurant on the morning of November 8, 1985; that although he normally kept $330 in the cash drawer, there was approximately $200 in petty cash plus another $200 in coin and currency in the cash drawer between 2 p.m. and 3 p.m. on November 7, 1985; the reading on the cash register tape for the prior day's total receipts was $658; there were jimmy marks on the back door of the restaurant; and the cash drawer was empty.

■ Defendants argue that Lawson's testimony as to the amount of the day's receipts as reflected on the register tape was erroneously admitted over defendant's objection. The register tape itself was never admitted into evidence. No explanation for the absence of the register tape is apparent from the record. If the original business records themselves are available, testimony consisting of the oral summation of their content is not an acceptable alternative, even if the summary is given by the records' custodian. (*People v. Clark* (1982),

108 Ill. App. 3d 1071, 1081.) We agree with defendants that that part of Lawson's testimony concerning the register receipts was admitted without a proper foundation and should have been stricken.

Defendants further argue that as to the petty cash left in the cash drawer, Lawson testified that cash disbursements were made from that drawer to employees on occasion. Since Lawson left between two and three in the afternoon of November 7, he would have no way of knowing what cash disbursements were made from the cash drawer during the evening. Moreover, the manager, Michael Phillips, who would have had knowledge of how much cash was distributed, was never called to testify, nor was he charged in connection with the case. Officer Riddle also testified that at the time of the initial investigation, Lawson estimated the loss at approximately $800, because he was not sure if a "money drop" had been made or some of the money had been taken home by his wife. Lawson's wife was never called to testify. Finally, defendants point out that Lawson's partner, Vincent Valentino, was never called to testify and could have taken the money himself. We note that none of the proceeds was ever recovered or found in the possession of the defendants.

■ *Corpus delicti* may be proved by circumstantial evidence or by the defendant's own testimony given in defense which may be judged by its improbabilities. (*People v. Daniels* (1983), 113 Ill. App. 3d 523.) Intent and unauthorized control can be proved by circumstantial evidence. (*People v. Meyer* (1982), 110 Ill. App. 3d 673.) Where an element of the State's case is proved circumstantially, the proof must be of a conclusive nature, producing a reasonable and moral certainty of the defendant's guilt and excluding any reasonable hypothesis of innocence. (*People v. Williams* (1980), 85 Ill. App. 3d 850.) The trier of fact need not accept the defendant's version of the facts but may consider its probability in light of the surrounding circumstances. *People v. Talach* (1983), 114 Ill. App. 3d 813.

In *People v. Bennett* (1987), 152 Ill. App. 3d 762, the defendant appealed from his conviction of theft of less than $300 (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(a)(1)). The evidence at trial consisted of Bennett's written statement that he had taken $50 from the store safe and the testimony of the merchandise manager that she had counted some of the money in the safe and discovered that a bundle of $5 bills which was marked $100, contained only $60. The manager admitted, however, that the missing $40 could accidentally have been put into a cash register or that the person who placed the money in $100 bundles could have miscounted it. She also admitted that shortages had occurred on a number of occasions. She noted that eight or more peo-

ple had access to the safe.

In reversing Bennett's conviction, the reviewing court stated as follows:

> "In the instant case, without even considering the many ways in which addition errors could have been made, the number of people who had access to the safe, the large sum of money in the safe, and the difference between the amount allegedly stolen and the amount stated in the defendant's confession, it is obvious that the State failed to meet its burden of proof. Juarze [the merchandise manager] could not verify from first-hand knowledge that the bundle in question ever actually contained $100. She could not testify from personal knowledge either to the total amount of money that was supposed to be in the safe or to the total amount that was actually in the safe. The State failed to prove beyond a reasonable doubt that anyone stole $40 from the safe." *Bennett*, 152 Ill. App. 3d at 763-64.

We are of the opinion that while the facts, independent of the defendants' confessions, may indicate that some type of criminal activity took place, they do not establish that the theft that defendants are convicted of took place. The testimony as to the amount indicated on the register tape was improperly admitted. Further, the State has failed to eliminate the reasonable possibility that the missing cash was taken or distributed in a legal manner. Lawson could only testify to how much money was in the drawer when he left between 2 and 3 p.m. on November 7, 1985. He could not testify from personal knowledge how much cash would be left at the end of the night, since Phillips and others had access to the cash drawer after Lawson left. Neither Mrs. Lawson, Lawson's partner, Valentino, nor Michael Phillips, all of whom had access to the money, was called to testify. (Compare *Lambert*, 104 Ill. 2d 375.) Moreover, the State failed to provide any link between the proceeds of the alleged theft and the defendants other than what was contained in the alleged confession.

The State points out that while a conviction may not be based solely upon the defendants' confessions without corroborating evidence, the *corpus delicti* need not be proved beyond a reasonable doubt exclusively by evidence independent of the confession. It is sufficient that there is some independent evidence that tends to prove that the offense occurred or corroborates the confession in its material elements to satisfy the court that the confession was not the product of the defendants' imaginations. *People v. Willingham* (1982), 89 Ill. 2d 352; *People v. Barkenlau* (1982), 105 Ill. App. 3d 785; *In re*

*S.D.S.* (1982), 103 Ill. App. 3d 1008.

■ The State submits that such evidence is present in this case. While the jimmy marks may have indicated criminal activity of some kind, without the necessary proof that money was taken, it does not provide the necessary corroboration of defendants' alleged confessions to the crime of theft. Moreover, according to the "confessions," the proceeds of the theft were divided three ways, each defendant receiving less than $200. Lawson's initial estimate of the theft was $800, which would mean that each of the defendants received $266. At trial, Lawson testified that the loss was $1,058, thus each of the defendants' share would have been approximately $352. Even assuming that the evidence proved that money was taken, the evidence does not corroborate the amounts stated in the confessions. We, therefore, agree with the defendants that the State failed to prove the *corpus delicti* of the offense of theft over $300.

Deciding this case as we do, we need not address the remaining issues raised by the defendants.

The judgment of the circuit court is reversed.

Reversed.

McLAREN, J., concurs.

JUSTICE LINDBERG, dissenting:

The law relied upon by the parties is well established. The resolution of this case turns on the facts of the incident and, more specifically, whether the evidence established that a theft of property valued in excess of $300 occurred so as to establish the *corpus delicti* of the offense (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(a)(1)), generally referred to as theft of property exceeding $300 in value.

The majority opines that Lawson would have no way of knowing what cash disbursements were made from the drawer containing the cash during the evening after he left. That is a matter that the jury may have considered and rejected. While it is necessary to establish the *corpus delicti* beyond a reasonable doubt, it is not necessary that the evidence considered by the jury aliunde the confession, by itself establish beyond a reasonable doubt the occurrence of the theft. *People v. Stepteau* (1986), 142 Ill. App. 3d 400, 491 N.E.2d 821.

In essence, the majority imposes upon the State the burden of establishing a chain of custody of the $400 Lawson testified he locked in his desk drawer before leaving for the day. The majority offers no authority for its legal conclusion that the State was required "to elimi-

nate the reasonable possibility that the missing cash was taken or distributed in a legal manner" (181 Ill. App. 3d at 882) to prove that a theft occurred. The majority imposes this additional burden upon the State in spite of evidence in the record that $400 or more was stolen and that defendants confessed stealing and sharing it, which, if the jury chose to believe it, was proof that a theft occurred beyond a reasonable doubt. See *People v. Murphy* (1978), 65 Ill. App. 3d 935, 382 N.E.2d 1260.

It is possible that upon examination of all the issues and evidence, I would arrive at the same ultimate conclusion as the majority. However, on the question of proof of *corpus delicti*, I would affirm the judgment of the trial court and proceed to a determination of the balance of defendants' issues.